NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-786 consolidated with 21-787

STANFORD BARNETT, ET AL.

VERSUS

THE ARC OF ACADIANA, INC., ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 201811148
HONORABLE THOMAS JAMES FREDERICK, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

D. KENT SAVOIE
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Chief Judge, Billy Howard Ezell, and D. Kent Savoie, Judges.

**AFFIRMED.**

**Cooks, Chief Judge, Dissents and assigns written reasons.**

Jeffrey W. Watson
Gordon McKernan Injury Attorneys
5656 Hilton Avenue
Baton Rouge, Louisiana 70808
(225) 923-4043
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    James Barnett, individually and on behalf of Lesli Ann Barnett
    Colette Neely, individually and on behalf of Lesli Ann Barnett

Byron Hutchinson
Spencer Calahan Injury Lawyers
827 Saint Louis Street
Baton Rouge, Louisiana 70802
(225) 387-2323
COUNSEL FOR PLAINTIFF/APPELLEE:
    Stanford Barnett, individually and on behalf of Lesli Ann Barnett

Joshua K. Trahan
Preis PLC
Post Office Drawer 94-C
Lafayette, Louisiana 70509
(337) 237-6062
COUNSEL FOR DEFENDANT/APPELLEE:
    The Arc of Acadiana, Inc.

**SAVOIE, Judge.**

James Barnett and Collette Barnett Neely appeal the judgment of the trial court, granting the exception of no right of action filed by Arc of Acadiana, Inc. and dismissing their claims with prejudice. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

This matter arises out of the death of Lesli Barnett, a fifty-four-year-old, mentally handicapped woman who passed away in 2018, while in the care of a facility owned by Arc of Acadiana, Inc. As she was sitting in her wheelchair unattended, Lesli slid down and was strangled by the seatbelt. Leslie was not married and had no children.

Stanford Barnett, Lesli's father, filed a negligence lawsuit against Arc of Acadiana, Inc. for wrongful death and survival action on December 28, 2018, in the Fifteenth Judicial District Court. On January 18, 2019, two of Lesli's siblings, James Barnett and Collette Barnett Neely, filed a separate petition for damages against Arc of Acadiana, Inc., alleging wrongful death and survival action in the Fifteenth Judicial District Court. The siblings' petition alleges that their mother pre-deceased Lesli, and their father abandoned Lesli during her minority to start another family. For these reasons, the siblings alleged that they were the proper parties to file the survival action under La.Civ.Code art. 2315.1 and the wrongful death action under La.Civ.Code art. 2315.2.

Arc of Acadiana Inc. filed an unopposed motion to consolidate the two cases that was signed on June 5, 2019. On January 11, 2021, Arc of Acadiana, Inc. filed a peremptory exception of no right of action against James Barnett and Collette Barnett Neely, contending that they are not the proper parties to this litigation. After a hearing on July 6, 2021, judgment was signed on July 22, 2021, granting Arc of Acadiana's peremptory exception of no right of action and dismissing James Barnett and Collette Barnett Neely's claims with prejudice. James and Collette now appeal.

## LAW AND DISCUSSION

The Louisiana Supreme Court in *Antonio Le Mon v. Nat'l Football League*, 19-1264, p. 2 (La. 9/6/19), 277 So.3d 1166, 1167, explained:

> The function of the exception of no right of action is to determine whether the plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the suit. *Eagle Pipe & Supply v. Amerada Hess Corp.*, 10-2267 (La. 10/25/11), 79 So.3d 246. In reviewing a ruling on an exception of no right of action, the reviewing court should focus on whether the particular plaintiff has a right to bring the suit and is a member of the class of persons that has a legal interest in the subject matter of the litigation, assuming the petition states a valid cause of action for some person. *Badeaux v. Southwest Computer Bureau, Inc.*, 2005-0612 (La. 3/17/06), 929 So.2d 1211, 1217.

"Because it involves a question of law, the standard of review of the trial court's granting of the exception of no right of action is *de novo* review." *Bennett v. Porter*, 10-1088, p. 8 (La.App. 3 Cir. 3/9/11), 58 So.3d 663, 670.

Louisiana Civil Code Articles 2315.1 and 2315.2 list the class of beneficiaries who have a right to recover under the applicable statutes. They include:

(1) The surviving spouse and child or children of the deceased, or either the spouse or the child or children.

(2) The surviving father and mother of the deceased, or either of them if he left no spouse or child surviving.

(3) The surviving brothers and sisters of the deceased, or any of them, if he left no spouse, child, or parent surviving.

(4) The surviving grandfathers and grandmothers of the deceased, or any of them, if he left no spouse, child, parent, or sibling surviving.

La.Civ.Code arts. 2315.1(A) and 2315.2(A). Therefore, according to the statutes, it is clear that Stanford Barnett, as the father of Lesli Barnett, has the right to recover in this case because he is the surviving parent. However, siblings James and Collette argue that Stanford abandoned Lesli during her minority and, subsequently, lost the right to bring these claims. Both La.Civ.Code arts. 2315.1(E) and 2315.2(E) include a provision that states: "For purposes of this Article, a father or mother who has abandoned the deceased during his minority is deemed not to have survived him."

2

James and Collette's right to file this litigation hinges on whether Stanford abandoned Lesli during her minority.

Louisiana Civil Code Articles 2315.1 and 2315.2 do not provide a definition for abandonment; however, La.Civ.Code art. 3506 does provide one. Louisiana Civil Code art. 3506 states, in pertinent part:

> Whenever the terms of law, employed in this Code, have not been particularly defined therein, they shall be understood as follows:
> ….
>
> 3. Abandoned.--In the context of a father or mother abandoning his child, abandonment is presumed when the father or mother has left his child for a period of at least twelve months and the father or mother has failed to provide for the child's care and support, without just cause, thus demonstrating an intention to permanently avoid parental responsibility.

The evidence shows that Stanford and Helen Barnett had six children. Lesli was the youngest, born in 1964. During the marriage, Lesli contracted meningitis and developed mental retardation. Lesli was institutionalized in a mental health facility and spent the rest of her life in these types of facilities. Stanford and Helen separated when Lesli was approximately three years old and eventually divorced. As a result of the divorce, Helen received full, primary custody of the children, with Stanford granted visitation. Stanford was also ordered to pay child support in the amount of $240.00 per month.

Stanford testified that he regularly visited his children, went to their ball games, paid child support and was a part of their lives. However, in regards to Lesli, he did not see her during these times, as she was institutionalized. Additionally, Stanford testified that Helen would not disclose to him where Lesli was institutionalized so that he could not visit her. Stanford explained that Helen became very upset if he mentioned Lesli, and he did not want to cause any trouble in the family. For these reasons, Stanford testified that he abided by Helen's wishes not to contact Lesli. Although he did not see her during this time, he did continue to pay child support for Lesli.

James and Collette argue that Stanford abandoned Lesli when he chose to stop visiting Lesli, and he did not provide care and support. James and Collette contend that Stanford's actions demonstrated an intention to permanently avoid parental responsibility for Lesli.

When Lesli passed away, she had four living siblings.[1] James and Colette filed the wrongful death/survival action; however, Richard Barnett and Michael Barnett did not join the petition. Richard and Michael testifed at the hearing on this matter. Their testimony supports their father's testimony.

Richard testified that Stanford would ask him how Lesli was doing when he visited. Richard explained that his mother and father's divorce was "ugly" and there was a lot of hurt. Richard testified that his mom did not want Stanford to visit Lesli. It is Richard's testimony Stanford fulfilled his child support obligation for he and his siblings. When asked by counsel whether he felt like Stanford abandoned Lesli, Richard replied, "No." Michael testified substantially similar. Michael also answered "no" when asked by counsel if he felt like Stanford abandoned Lesli.

There is some uncertainty as to when Stanford stopped paying child support. Collette asserts that Stanford quit paying child support on her birthday. She is eleven months older than Lesli. James contends it was earlier than that. Stanford testified that he stopped when Collette turned eighteen, but, later in his testimony, he stated it was later. He could not remember exactly when he stopped paying child support. Richard testified that Stanford paid child support until they were eighteen years old. Michael stated that he did not know when the child support payments stopped.

Based on the evidence, we cannot find that Stanford abandoned Lesli. The first prong of the abandonment test is whether Stanford "left [Lesli] for a period of at least twelve months." La.Civ.Code art. 3506(3). Stanford and Helen divorced. He did not "leave" his children. The testimony is that Stanford asserted his visitation

---

[1] A fifth sibling pre-deceased Lesli.

rights and continued to be a part of his children's lives.  We can assume that had Lesli not been institutionalized in a mental health facility, Stanford would have continued to visit her alongside his other children.  The second prong of the abandonment test is whether Stanford "failed to provide for [Lesli's] care and support, without just cause." This fact has not been established.  On the contrary, the wealth of evidence supports the argument that Stanford continued to pay child support for Lesli, at the very least, through her seventeenth birthday.  Finally, based on the foregoing, we cannot find that Stanford demonstrated "an intention to permanently avoid parental responsibility."

## DECREE

The judgment of the trial court is affirmed.  Costs of this appeal are assessed to James Barnett and Collette Barnett Neely.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.

Uniform Rules—Courts of Appeal, Rule 2-16.3.

5

STANFORD BARNETT, ET AL.

VERSUS

THE ARC OF ACADIANA, INC. ET AL.

COOKS, Chief Judge, Dissents.

In these consolidated cases James Barnett and Collette Barnett Neely appeal the judgment of the trial court granting The Arc of Acadiana, Inc.'s (Arc) exception of no right of action, dismissing their survival action and wrongful death claims and they appeal the denial of their motion for partial summary judgment as moot.

This litigation arose out of the tragic death of James and Collette's sister, Lesli Barnett, a 54-year-old mentally handicapped woman. The record established Lesli contracted meningitis at an early age when she was less than three years old and was institutionalized around the age of eight and remained so for the remainder of her life. Her father, Stanford Barnett, says he stopped seeing Lesli when she was about three or four years old and never visited her after she was institutionalized because, he says, his ex-wife did not want him to visit Lesli. That assertion is contradicted by all his other children's testimony. Sadly, Lesli, sitting unattended in her wheelchair while at Arc, slid down and was strangled by the seatbelt. She was not married, had no children, and is survived by her father and four siblings.

Stanford Barnett filed survival action and wrongful death claims against Arc. Shortly thereafter, James and Collette filed a separate survival action and wrongful death claim against Arc. In their petition for damages James and Collette alleged

1

Stanford abandoned Lesli thus they were the proper parties to file the claims. They asserted they visited their sister throughout her life and continued to see her after their mother died.

Arc filed a motion to consolidate the two cases, which was granted. James and Collette filed a Motion for Partial Summary Judgement asserting they are the proper parties to bring these actions because Stanford abandoned Lesli during her minority. In its Answer to the complaint Arc filed a peremptory exception of no right of action against James and Collette, contending they are not the proper parties to the litigation. After a hearing, the trial court granted the exception of no right of action, dismissing James and Collette's claims with prejudice. The trial court also found James and Collette's Motion for Partial Summary Judgment was rendered moot by its finding on the exception. James and Collette appealed the trial court rulings and are before the court under docket numbers 21-786 and 787. In this opinion the majority affirms the trial court's ruling on the exception of no right of action. For the reasons set forth herein I vigorously disagree with the majority's reasoning and result, and I respectfully dissent.

> In *Mississippi Land Co. v. S & A Properties II, Inc.*, 01-1623, pp. 2-3 (La.App. 3 Cir. 5/8/02), 817 So.2d 1200, 1202-03, we stated:
>
>> Under La.Code Civ.P. art 927, a defendant may raise the peremptory exception of no right of action. An exception of no right of action has the function of determining whether the plaintiff has any interest in the judicially enforced right asserted. *St. Jude Medical Office Bldg., Ltd. Partnership v. City Glass and Mirror, Inc.*, 619 So.2d 529 (La.1993). The function of this exception is to terminate the suit brought by one who has no judicial right to enforce the right asserted in the lawsuit. *Yolanda F.B. v. Robert D.R.*, 00-958 (La.App. 3 Cir. 12/6/00), 775 So.2d 1107. The determination of whether a plaintiff has a right of action is a question of law. *Horrell v. Horrell*, 99-1093 (La.App. 1 Cir. 10/6/00), 808 So.2d 363, *writ denied* 01-2546 (La.12/7/01), 803 So.2d 971. Accordingly, we review exceptions of no right of action *de novo*. *Id.*

2

*Stewart v. Gordon,* 17-812, p. 3 (La.App. 3 Cir. 10/3/18), 316 So.3d 1052, 1056, *reversed on other grounds*, *Rismiller v. Gemini Ins. Co.,* 20-313 (La.6/30/21), 330 So.3d 145, *reh'g denied*, 20-313 (La.9/30/21), and *cert. denied*,142 S. Ct. 1229 (2022). *See also, Myles o/b/o Myles v. Howell*, 52,716 pgs. 3-4, (La.App. 2 Cir. 6/26/19), 277 So.3d 1218, 1221, *writ denied*, 19-1207 (La. 10/15/19), 280 So.3d 603.

As the majority notes, the issue in this case as to who is the proper party to file this litigation hinges upon whether Stanford abandoned Lesli during her minority. It was undisputed in the trial court hearing that once Lesli was institutionalized at age eight, Stanford played no meaningful part in her life, other than the payment to her mother of $240.00 per month child support for their six children which he stopped paying at least eleven and one-half months before Lesli turned eighteen. Stanford testified he stopped visiting Lesli when she was three or four years old, and he admitted he never visited his daughter after she was institutionalized and did not provide anything for her throughout the remainder of her life. On occasion he would ask Lesli's siblings how she was doing. That was the extent of his fulfillment of his obligations to his disabled daughter for the forty-six years she lived in an institution.

There is some uncertainty as to exactly when Stanford stopped paying child support for Lesli. Stanford could not remember when he stopped paying support though he maintained he paid support until all his children were twenty years old. He says he paid in cash and thus has no real record of his payments. He also says he usually delivered the payments to his daughter Collette Barnett or one of her brothers. Richard Barnett testified Stanford paid child support until his siblings were eighteen years old. Michael Barnett was not sure when support payments stopped.

3

Collette asserts Stanford paid support for her and Lesli until Collette's eighteenth birthday. *Stanford testified he could not dispute Collette's testimony.* Lesli was born on January 19, 1964, and Collette turned eighteen on February 8, 1981. Since Lesli was eleven and one-half months younger than Collette, if Colette's testimony on child support is accurate, Stanford failed to pay child support for eleven and one-half months for Lesli during her minority. The majority finds this would be insufficient to meet what it identifies as "the first prong of the abandonment test," *i.e.*, that a parent has "failed to provide for the child's care and support" for twelve months. Thus, the majority concludes *on this sole finding* that the trial court was correct in holding Stanford did not legally abandon Lesli as defined in La.Civ.Code art. 3506(3).[1] This is a misapplication of the law.

*The finding of abandonment under La.Civ.Code art. 3506(3) does not turn solely on whether Stanford failed to pay court ordered financial support for a period of twelve months.* Although this twelve-month period is *presumptive* proof of abandonment **it is not the end of the inquiry**, and **it is not the only proof positive of abandonment.** Proof of such failure to pay for a twelve-month period of time would of course help to establish a presumption against Stanford. Such proof is deemed to be presumptive evidence of a parent's intent to abandon its child under these provisions. *But this failure to pay financial support is not the sole manner by which to establish Stanford's intent to abandon Lesli and his actual abandonment of her.* The record is replete with much evidence of Stanford's abandonment of Lesli for many years during her minority and throughout the entirety of her adult life. According to Stanford's own testimony he felt Lesli had been "killed" when her

---

[1] Abandoned.--In the context of a father or mother abandoning his child, abandonment is presumed when the father or mother has left his child for a period of at least twelve months and the father or mother has failed to provide for the child's care and support, without just cause, thus demonstrating *an intention to permanently avoid parental responsibility*. (emphasis added)

meningitis rendered her severely handicapped. Thereafter he acted as though Lesli did not exist. The fact that he never thought he was paying support for Lesli is evidenced by Colette's testimony regarding his phone call just before *her* eighteenth birthday. She testified Stanford stopped payments at least eleven and one-half months before Lesli reached the age of majority because he thought his child support obligation ended when *Collette* reached majority. *Lesli's age was not a factor in his consideration.* Collette testified she thought he was calling in remembrance of her birthday, which had not always happened, only to learn from his lips that he called to make sure this was indeed her 18th birthday expressing he was happy to make his last support payment! She was understandably crushed, but she says it was par for the course in his historic treatment of she and her siblings. *Stanford's intent to abandon Lesli came from his own mouth* when he spoke with Collette and bolsters his own testimony that he considered Lesli as "killed" after she was left debilitated by her disease.

The majority opinion effectively turns the statutory presumption on its head and establishes some sort of <u>presumption of non-abandonment</u> in favor of Stanford which the law does not grant. The mere fact that Stanford paid child support which included support for Lesli until eleven and one-half months shy of her eighteenth birthday, a period of time just shy of the twelve-month presumption, does not raise a non-abandonment presumption in favor of Stanford's right to sue for Lesli's death. The majority compounds this error by further asserting "we can assume that had Lesli not been institutionalized in a mental health facility, Stanford would have continued to visit her alongside his other children." The majority cannot make such an assumption. It is belied by the evidence presented. Contrary to Stanford's representations, Lesli's siblings testified that Stanford was told where Lesli was institutionalized, and he consistently rebuffed their efforts to take him to visit her.

5

Stanford's only assertion of a "just cause" not to visit Lesli is that her mother did not want him to see her. Aside from the fact that this excuse is by no means a just cause for never seeing his child, it too is belied by the testimony of Lesli's siblings.

Colette says she always told Stanford where Lesli was living, and she repeatedly encouraged him to visit her. According to her testimony Lesli was not institutionalized until she was eight years old, yet Stanford says he last saw Lesli when she was three or four years old after her mother, Helen, moved in with Helen's father just a block away from where the family had been living. During those five years when the mother and children lived at their grandfather's home the testimony of all of Lesli's four surviving siblings shows that the mother did not interfere with Stanford's visitation with his children. According to Stanford's son Richard D. Barnett, their mother never intentionally kept Lesli from Stanford. He said she allowed Stanford to visit all his children, "She did not hide [Lesli]" from him. Richard explained in his testimony:

> In my mother's later years that he had not visited [Lesli] those many years, so what would be the point for [Stanford] to do it now just to upset, you know. All it would do is, you know, confuse my little sister and upset the family…

In other words, Lesli's mother did not prohibit Stanford from seeing Lesli nor hide her whereabouts from him but simply thought in later years after Lesli was an adult that since Stanford had purposely had no contact with the child for so many years it might be better if he just left her alone. Lesli's brother, Michael A. Barnett, testified he lived with their mother for thirty-three years. He acknowledged that there were times when his mother would tell him "Don't say anything about Lesli, don't say anything about me." Michael did not testify that anyone, including his mother, ever kept Lesli's whereabouts secret from Stanford nor that his mother kept

6

Stanford from seeing Lesli during the five years she lived with her siblings at their grandfather's house, a block away from where Stanford was living.

Perhaps most telling is Lesli's brother, James Keith Barnett's, testimony concerning their lives as children with Stanford. He corroborated Collette's testimony and contrary to Stanford's assertion that the couple divorced simply because they just could not get along, he explained the severe abusive behavior by Stanford toward his wife and children which caused their mother to flee for safety to her father's home. Colette referenced in her testimony Stanford's abusive behavior toward her mother and siblings, but James explained it in greater detail.

> Oh, I lived it worse than [Collette]. I watched my mom get beat, get pushed through a window. It was on the door. Had food thrown at her, constantly yelled at, constantly belittled.

> We were hit constantly. It wasn't like one, two, three whipping. It was a beating, even sometimes with a buckle. Constantly slapping us. And we stayed with him because of mom's firm—she was Roman Catholic also and very much religious. We kept staying with him because it was her belief that divorce was wrong. But the two priests for Holy Family, Monsignor Norton and Father Waguespack, constantly kept telling mom to go, you have to go. "It is not against the church if you are saving yourself and your children. Your grandfather is clearly waiting." But mom stayed.

> And the reason we left was mom's dear friend came one time after dad had gone to work. Mom had been beaten, Ann came over to talk to us, and she said "Helen, we're packing the car, we're going." And so we, whatever we took inside the car, we moved one block to my grandfather's house and that's all we had. Dad did not allow us to go back to the house to take anything else.

In response to counsel's questioning as to whether any of Stanford's abuse was reported to the police James explained:

> There were a number of times the police came to the house while we were still living with him. And back then, you know, it was a good old boy thing, they never did anything to him.

James also testified that Lesli was about three years old when his mother and siblings moved to his grandfather's house and that Lesli was about eight years old

7

when she went into the first institution. According to James, Stanford would pick up the kids for his visitation, but he thought Lesli was "too much to handle" so she was left at home "the last few times we went with him." Interestingly, in response to counsel's question to Stanford "you never saw, spoke or visited Lesli from the time she was three years old, for fifty-one years until her death…" Stanford replied "Correct." Just as Stanford had testified in his deposition, he felt Lesli had died. The evidence shows that is how he thought of her ever since she was incapacitated. Could there be any stronger evidence of abandonment of one's minor child? The majority says that "Stanford asserted his visitation rights and continued to be a part of his children's lives." The testimony of all of Lesli's four surviving siblings and Stanford himself unequivocally establishes this assertion finds no support in the record filed with this court.

In this case the court does not need to look to the presumption set forth in Article 3506(3) because here, there is compelling evidence of Stanford's intent to abandon Lesli and his actual abandonment of her during her minority, and for the remainder of her life. By his own testimony *Stanford thought of her as dead* and according to his recollection did not see her or do anything for her from the time she was three or four years old until she died at age fifty-four. The fact that he may have paid court ordered support until just a few days shy of twelve months before she reached the age of majority is not controlling as the majority suggests. *Article 3506(3) speaks to the **intent to abandon a child** during its minority, and it is the proof of that intent and the actual failure during the child's minority to take parental responsibility for one's child that prohibits such a parent from bringing a survival or wrongful death action.*

> La.C.C. arts. 2315.1(E) and 2315.2(E) act as barriers to a parent **who failed during the child's life to take parental responsibility** from bringing an action to benefit from the child's death. These

8

> limitations on a parent's right to sue obviously pale in comparison to what could be lost in a termination of parental rights case. Lamentably, this is not a case involving termination of parental rights, would that it were.

*Myles v. Howell, et al.*, 52,716, p. 7, (La.App. 2nd Cir. 6/26/19), 277 So.3d 1218, 1222, *writ denied* 19-1207 (La.10/15/19), 280 So.3d 603 (emphasis added).

Louisiana Civil Code Articles 2315.1 and 2315.2 set forth the order of persons who may file a claim for survival actions and for wrongful death respectively and subparagraph (E) of both articles state: "For purposes of this article, a father or mother who has abandoned the deceased during his minority is deemed not to have survived him."

Here, as in *Myles*, the evidence shows that the father, Stanford, failed to meet his parental responsibilities of care and support to his severely handicapped child and demonstrated his clear intent to abandon her. Because articles 2315.1 and 2315.2 do not define "abandoned" or "care and support" the court must look to the definition of abandonment provided in the Civil Code at La.Civ.Code art. 3506(3), see *Myles*, and to the definition of "care and support" required of parents provided in La.Civ.Code arts. 223, 224 and 226.[2]

The language in article 3506(3) "*thus demonstrating an intention to permanently avoid parental responsibility*" is the operative language. The article sets forth two factors which if proven establishes presumptive abandonment, but it does not foreclose other evidence to establish a parent's intent to permanently avoid their parental responsibilities set forth in the Civil Code.

---

[2] During Lesli's minority, Stanford's obligation of "care and support" referred to in La.Civ.Code art. 3506(3), which he must provide unless he shows just cause for his failure to do so, is found in Louisiana Civil Code Articles 223, 224, and 226. La.Civ.Code art. 223 provides "Parental authority includes rights and obligations of physical care, supervision, protection, discipline, and instruction of the child;" La.Civ.Code art. 224 mandates "Parents are obligated to support, maintain, and educate their child;" and La.Civ.Code art. 226 imposes upon parents "a moral obligation to provide moral, social, and material direction for their child."

The majority does not discuss whether Stanford met his obligations of care and support to Lesli during her minority as required in La.Civ.Code arts. 223, 224 and 226. These requirements entail more than the mere payment of a court ordered support payment. The majority finds the evidence does not establish that Stanford " 'failed to provide for [Lesli's] care and support, without just cause'" because, it reasons, that "Stanford continued to pay child support for Lesli, at the very least, through her seventeenth birthday." Thus, *based on this finding alone* the majority concludes "we cannot find that Stanford demonstrated 'an intention to permanently avoid [his] parental responsibility.'" The evidence belies this conclusion, and it is not supported by the applicable law.

The Louisiana Supreme Court has held that just cause in the context of child abandonment statutes and code articles is an affirmative defense to be established by the parent.

> Our holding that just cause is an affirmative defense is further supported by the fact that the "just cause" defense falls squarely within the ambit of so-called "justification" defenses. In *State v. Cheatwood,* 458 So.2d 907 (La.1984), we stated that "justification" defenses "are not based on the nonexistence of any essential element of the offense, but rather on circumstances which make the accused's conduct excusable on policy grounds [; hence,] such defenses should be treated as affirmative defenses which the accused must establish by a preponderance of the evidence." 458 So.2d at 910. As with other affirmative defenses, the "just cause" defense does not negate any element of the cause of action or of the crime, but merely negates culpability on policy grounds despite the proof of each of the essential elements.

> Just cause for abandonment clearly is based on policy grounds that make the accused parent's failure to provide care and support excusable. As one commentator noted, "there may be mitigating, even exculpatory, factors which the court may consider in determining the state of mind of the parent as it pertains to the question of abandonment and subsequent termination of parental rights." Phillip J. Prygoski, *When a Hearing is Not a Hearing: Irrebuttable Presumptions and Termination of Parental Rights Based on Status,* 44 U.Pitt.L.Rev. 879, 891 (1983). Hence, just cause is a justification defense and thus an affirmative defense, and the State therefore is not

required to prove absence of excusable circumstances for the failure to provide care and support.

Finally, we note our agreement with the State's argument that to construe Article 1015(9) as placing upon the petitioner in a termination proceeding the burden of establishing the lack of just cause for failure to provide care and support is to impose an impossible burden of negating all possible or hypothetical just cause defenses as part of the petitioner's case-in-chief.

Accordingly, we conclude that La.Child.Code art. 1015(9) creates an affirmative defense of "just cause" by which the parent can preclude a finding of abandonment upon establishing by a preponderance of the evidence a valid excuse for the failure to provide care and support for the child.

*State in Int. of ML*, 95-45, pgs. 9-10, (La. 9/5/95), 660 So.2d 830, 834–35 (footnotes omitted).

The "just cause" provision in La.Civ.Code art. 3506(3) is likewise an affirmative defense to be proved by Stanford. His sole excuse for abandoning Lesli, which is contradicted by the testimony of Lesli's siblings, no more establishes just cause for his failure to maintain any contact with Lesli or provide her any care and support than those parents who have asserted that the fact of their incarceration was just cause for not maintaining contact and not giving any care and support to their minor child.

The father's sole justification for the failure to support the children is that he was incarcerated. We rejected this argument, stating that incarceration is not a just cause defense for failure to support children *or maintain contact with them* in a termination of parental rights case…

*State in Interest of B.H. v. A.H.*, 42,864, p 13 (La.App. 2 Cir. 10/24/07) 968 So.2d 881, 889, *citing State in Interest of M.L.*, 95-45 (La.9/5/95), 660 So.2d 830 (emphasis added).

Moreover, it is not marriage or the absence of the marriage that establishes Stanford's obligations of care and support as Lesli's father.

Louisiana Civil Code article 227 provides that "[f]athers and mothers, by the very act of marrying, contract together the obligation of supporting, maintaining, and educating their children." Clearly the children are the intended beneficiaries of this obligation. Moreover, this obligation to support offspring is not restricted to married parents; rather, *the fact of paternity or maternity, and not the act of marriage, obliges parents to nourish and rear their children. Hogan v. Hogan,* 549 So.2d 267 (La.1989) (citing 1 M. Planiol, Civil Law Treatise, pt. 2, § 1681).

*Id. at* 888 (emphasis added).

Additionally, care and support of such a severely handicapped child as Lesli requires more than the mere payment of court ordered child support regardless of how long he actually paid her mother and is not excused because Lesli was institutionalized.

Defendant takes the position that since there are mental institutions in this state able and willing to take care of the interdict, that it is not the duty of defendant to support said child.

We agree with the trial judge that under LSA-C.C. Art. 229 that the support of the child is the primary duty of the parents and this burden should not fall on the state.

*Johnson v. Johnson*, 128 So. 2d 779, 779–80 (La.App. 3 Cir. 1961).

In *In re Tutorship of Blanque*, 97-249 (La.App. 5 Cir. 9/30/97), 700 So.2d 1077, *writ denied*, 97-2744 (La.1/16/98), 706 So.2d 979, the Louisiana Fifth Circuit discussed the obligations imposed on a parent of a disabled child under the provisions of La.Civ.Code art. 229, which govern a parent's responsibility to its child during the child's majority when the child cannot care for itself. Describing the parents' obligation during the child's majority as **less than a parent's obligation of care and support for its minor child** under the Civil Code, the court explained the greater needs and the greater concomitant obligations imposed upon the parent of a handicapped child such as Lesli. The court found that a father's "obligation under La. C.C. art. 229 should come after whatever public assistance [his adult child]

12

might be able to collect." *Id.* at 1081. The same is more so for a handicapped child during its minority.

The reciprocal alimentary obligation provided in La. C.C. art. 229, between ascendants and descendants is different from the child support obligation of parents for their minor children. La. C.C. art. 227; La. R.S. 9:315 et seq. The obligation is not nearly as broad, applies only to those in need and encompasses only the basic necessities of food, clothing, shelter and health care. *Banquer v. Banquer,* 554 So.2d 790 (La.App. 5th Cir.1989). It generally does not include educational expenses or the other special expenses of a minor's rearing. *Suire v. Miller,* 363 So.2d 945 (La. App. 3rd Cir.1978). Further, the obligation only arises upon proof of the inability to obtain these necessities from other sources. *Banquer v. Banquer,* supra.

Based on these principles, David Blanque would have us read the statutes very narrowly, to include the most limited form of shelter, clothing, food and health care and not one single thing more. We disagree with this limited interpretation of the alimentary obligation that he owes his daughter.

First, it should be noted that La. C.C. art. 230, which defines the scope of the alimentary obligation includes "what is necessary for the nourishment, lodging and support of the person who claims it." Moreover, each case must be considered on its own facts. While a more restrictive reading of the statute might be given in a different case where the child in question was a more healthy, more self sufficient adult, the result reached in this case is mandated by the facts.

Jennifer is severely disabled. Thus, where the term clothing might mean just the articles themselves in another case, in this case she must additionally be provided the assistance to dress. While shelter in another case might mean simply a protected environment from the outdoors, in Jennifer's case the "shelter" or home in which she resides must be specially designed to fit her special orthopedic needs. Health care, as applied to this case because of Jennifer's mental disability must include activities that might not be included for a less disabled adult. We find the same to be true in all aspects of Jennifer's day to day activities. Jennifer's needs or necessities are far different from and greater than those of a less disabled person. Jennifer requires and deserves more time and expense.

David Blanque also argues that he should not be cast because Jennifer has other means or other sources from which to obtain her necessities. By this he is referring to federal aid. In other words, he is arguing that his obligation should commence after any aid Jennifer is "entitled" to from SSI.

. . . .

13

We find no merit in David Blanque's argument that his obligation under La. C.C. art. 229 should come after whatever public assistance Jennifer might be able to collect.

*Tutorship of Blanque*, *Supra*. at 1079–82.

Jennifer, like Lesli in this case, was a severely handicapped child whose father also believed he had no obligations to his adult handicapped child because, he asserted, she had all she needed living with her mother and receiving government assistance. The court was not moved by David Blanque's callous attitude no more than the majority should be moved by Stanford's notion that he could just consider his child as "killed" and wash his hands of her save for paying minimal financial support to her mother and ending that support at least eleven and one-half months shy of her eighteenth birthday. Stanford's complete lack of any contact with his child after she was institutionalized and his non-existent care and support for his child as a minor, and throughout adulthood, should not permit him to seek damages for her untimely death instead of her siblings who cared for her and visited her providing her care and support in the full sense of those words.

Lesli's institutionalization did not eliminate her father's responsibilities under the Civil Code but in fact heightened the parental responsibilities imposed upon him.

For the reasons stated I dissent and would reverse the trial court's sustaining Arc's exception of no right of action. The evidence shows that Stanford abandoned Lesli and therefore he is not the proper party to bring either action. James and Collette are the proper parties under the provisions of Article 2315.1 and 22315.2.

14